JAMES E. BURKE *v.* C. H. BEECHER.

October Term, 1928.

Present: WATSON, C. J., POWERS, SLACK, MOULTON, and CHASE, JJ.

Opinion filed January 8, 1929.

*Burton E. Bailey* and *H. C. Shurtleff* for the relator.

*Warren R. Austin* and *Theo. E. Hopkins* for the defendant.

CHASE, J. At the March election, 1927, in the city of Burlington, the relator and the defendant were the only candidates for the office of mayor. The defendant was declared elected by a vote of 3,191 to 3,108. Thereupon, the relator brought his complaint to this Court for a writ of *quo warranto* based upon allegations that illegal votes were cast and counted for the defendant in such number that he was in consequence declared elected when in fact the relator received more legal votes than were cast for the defendant; and that the election was tainted with bribery through the unlawful use in behalf of the defendant of money and intoxicating liquor. A commissioner was appointed who has taken and filed a recount together with a large amount of testimony and numerous exhibits. The recount gave the relator 3,133 votes, a gain of 25, while the vote of the defendant was unchanged at 3,191.

The parties agree that certain votes which have been counted are illegal, and, for the purposes of this case, we shall adopt their view of the law respecting them. They fall into the following classes, *viz.:* (1) Votes of persons whose names were written in the grand list in purple ink without authority after

it had been certified and filed by the assessors; (2) votes of delinquent taxpayers; (3) votes of persons whose names were added to the check list on election day; (4) of persons whose names were not on the grand list at all; (5) of persons who became of age between April 1, 1926, and election day and were not listed for taxation at the assessment next preceding this election; (6) of persons not naturalized; and (7) of wives having non-resident husbands.

We find, upon an examination of all the evidence, although our findings are not in all respects in accord with the computations made by either party, that in the first class 44 votes were cast and counted for the defendant and 34 for the relator; in the second class, 15 for the defendant, 7 for the relator; in the third class, 23 for the defendant, 16 for the relator; in the fourth class, 8 for the defendant, 4 for the relator; in the fifth class, 15 for the defendant, 15 for the relator; in the sixth class, 1 for the defendant, 1 for the relator; in the seventh class, 2 votes are claimed. We find that one of these was cast by a voter whose husband was not shown to have been a non-resident, and it did not appear for whom the other vote was cast.

The relator has divided the so-called purple ink voters into five divisions, viz.: (1) Those which are wholly unexplained; (2) and (3) those who were otherwise shown to have had no list taken or who cannot remember whether it was taken or not; (4) those who testified that their list was taken; and (5) those whose names appeared in the grand list assessed for property but not for polls. He admits that those in the first three divisions were not legal voters, but believes those in the last two were. He agrees in his brief that the addition of the names of these persons in purple ink was of no legal effect and does not claim that because their names were on the check list they are conclusively shown to have been legal voters. This, of course, is in accord with *State ex rel. Cawley* v. *O'Hearn*, 58 Vt. 718, 6 Atl. 606. While he concedes so much, he, nevertheless, insists that the grand list does not control and that we should go back of it and treat as properly grand-listed all of the purple ink voters who are shown to have been entitled to have been legally grand-listed. The answer to this is that the time allowed by law for amending and correcting the grand list has, and at the time of this election had, long since expired. Chapters 42 and 43 G. L. as amended. Persons who failed to take

timely and necessary steps provided by law to become qualified voters, who did not see to it that they were grand-listed or that they were grand-listed for their polls as well as for property, did not as a matter of law come within the provisions of No. 172 of the Acts of 1925, which amended the Burlington city charter and requires that a legal voter shall, among other things, be one "whose list shall have been taken for the purpose of taxation * * * * *." Such persons did not pay the taxes legal voters were bound to pay. They will not now be given a standing equal to that enjoyed by those who were properly grand-listed, assessed the taxes they should have paid, and paid them. We shall treat all the so-called purple ink voters alike. While it is doubtful whether this makes any difference in the outcome of the case, it has been thought best to dispose of the question here. It now appears that in both the original count and in the re-count the defendant was given one hundred and six votes cast by persons in the classes admittedly illegal and the relator, seventy-seven.

 Certain so-called necessarily absent voter, and certain so-called sick voter, ballots were also counted for both parties. Three absent voter ballots were shown to have been cast and counted for the defendant although not accompanied by an affidavit executed as required by No. 7 of the Acts of 1919. No serious claim is now made that they are valid. They should be added to the other illegal votes counted for the defendant and deducted from his total. This leaves him 3,082.

 The relator insists that all of the sick voter ballots are invalid because the statute then in force, No. 5 of the Acts of 1925, did not apply to this kind of an election. In terms, that act only covered "a general, special or primary election, or any special meeting in which a check list and printed ballot are used and which is legally warned and called for the purpose of voting on any question concerning the providing of funds for town or municipal use." The defendant does not claim that this election came within the express terms of the definition above quoted, but says the sick voter statute should be construed to be co-extensive with the necessarily absent voter statute then in force because they are *in pari materia*. The statute relating to voters necessarily absent from their place of residence on election day was passed before the sick voter statute, and had in its definition of application the words "county, city or town" im-

mediately following the word "primary" so that it read "any general, special, primary, county, city or town election or any special meeting," etc. Thus the necessarily absent voter statute without question covered this election.

It is needless to repeat here the substance of what was said by this Court as recently as *In re James,* 99 Vt. 265, 132 Atl. 40, regarding the construction of statutes dealing with the same subject, which was to the effect that the legislative intent must control. We shall follow the principles there stated so far as they are applicable. Here, while the general subject-matter of both statutes is the same, *viz.,* absent voting, the Legislature has seen fit to divide absent voters into two groups: (1) Those who cannot go to the polls because they are necessarily absent from their place of residence on election day; and (2) those who cannot go to the polls because they are physically unable to do so on election day—and to grant greater privileges to the first group than it did to the second. We can see no good reason why they should not have been treated alike, none has been advanced, and there probably was none. Indeed, in 1927 the law was amended to give the same rights to both. No. 2 of the Acts of 1927. Yet it is not our business to amend statutes under the guise of construction. We will merely ascertain, if possible, and give effect to the manifest legislative intent, and it seems apparent that the Legislature of 1925 intended to make just the distinction between these two laws that it did make. In each the definition of application is found in section 1. In each act section 2 is just enough different to recognize the distinction made in section 1, and it seems extremely unlikely that the omission of the words "county, city or town" in the sick voter law was the result of inadvertence rather than design. Accordingly, we hold that all of the sick voter ballots cast at this election were invalid. Of these, 66 were shown to have been counted for the defendant and 14 for the relator. When these 66 votes are deducted from those counted for the defendant, we find that he had 3,016 votes which have not been shown to be illegal. As this is a private suit (*State ex rel. Venner* v. *Zanleoni,* 97 Vt. 212, 122 Atl. 495), the burden is upon the relator to show that votes counted for the defendant are invalid. In so far as he fails to do this, the count for the defendant will stand, and we therefore find that the defendant received 3,016 valid votes at the election in question.

█ If the relator would supplant the defendant in the office he now holds, the burden of proof resting upon him requires that he show that he received more valid votes than were cast and counted for the defendant. That is, more than 3,016.

██ By deducting the votes we have already found were illegally cast and counted for the relator from his total vote as recounted we find that 3,042 remain, and if the relator has discharged the burden of showing that these are all valid votes he must prevail, because they are more numerous than the defendant's votes he has failed to show invalid. If nothing further appeared, very likely the fact that they were counted for him by the election officials would be sufficient evidence of their validity. 20 C. J. 122; McCrary on Elections (4th ed.) § 466a. But the evidence before us shows that in addition to the illegal votes that we have already found were cast and counted for the respective parties, more than seventy votes in the different classes admittedly illegal were cast and counted, but it does not appear for whom. We cannot deduct them from the defendant, because the relator has failed to show they were counted for him. Nor do we know, or have any means of ascertaining, whether some or all of them go to make up the relator's vote to the apparent total of 3,042. The defendant has argued that, as the burden of proof is on the relator, all votes shown to be illegal and not shown to have been counted for the defendant must necessarily be deducted from the count of the relator; while the relator believes these votes should be apportioned and that from each party should be deducted "such per cent. of the illegal votes as each candidate received of the total vote cast." Neither party is exactly right. There is no occasion to do more than apply the well-known, long-established principles which attach to the burden of proof to see what effect these illegal votes have in this case. They make the number of legal votes cast for the relator impossible of determination with sufficient certainty so that we can find that he received more than 3,016 legal votes, the number we have found the defendant received. That being so, the relator has failed to discharge the burden of showing his title to the office he seeks, for the title of the present incumbent is presumed to be good until the contrary is shown. *State ex rel. Danforth et al.* v. *Hunton et al.*, 28 Vt. 594.

█ We have not treated in detail certain disputed ballots or voters especially mentioned in the briefs, as these are few

comparatively and in any event would not change the result. As was said in *State ex rel. Venner* v. *Zanleoni, supra,* "The mere fact that illegal votes were cast does not vitiate the election."

The relator claimed, and introduced some evidence tending to show that paid workers for the defendant procured votes to be cast for the defendant through the use of intoxicating liquor and the unlawful use of money. A careful review of this evidence leaves us with the distinct impression that it is not very reliable; nor is there anything whatever to show that the defendant knew or had reason to believe that any such unlawful things were done in his behalf. The evidence is not trustworthy enough for us to find the facts as claimed by the relator. Nor does the evidence that the defendant gave some candy to workers at the polls lead us to believe that he thereby attempted to, or did, influence any voter in casting his ballot. Nothing unlawful was shown concerning defendant's expense account or conduct.

*Complaint dismissed with costs, including the services and expenses of the commissioner, but with the relator's costs on preliminary issues or questions heretofore decided in his favor deducted.*